1
2
3
4
5
6
7               UNITED STATES DISTRICT COURT

8                    DISTRICT OF OREGON

9                    PORTLAND DIVISION

10

**DEBORAH R. NOLAN,**                    )
                                         )        3:10-cv-01571-HU
               Plaintiff,                )
                                         )
      vs.                                )        OPINION AND
                                         )        ORDER
**TRANSCEND SERVICES, INC.,** a          )
Delaware Corporation,                    )
                                         )
               Defendant.                )
      _____

Brian A. Buchanan
PO Box 18671
Salem, OR 97305

      Attorney for Plaintiff

Carol A. Noonan
Kaley L. Fendall
DAVIS WRIGHT TREMAINE LLP
1300 SW Fifth Avenue, Suite 2300
Portland, Oregon 97201

      Attorneys for Defendant

HUBEL, Magistrate Judge:

                    **Opinion and Order**

      Pursuant to Federal Rule of Civil Procedure ("Rule") 56(c),

defendant Transcend Services, Inc. ("Defendant") moves for summary

judgment as to all of plaintiff Deborah R. Nolan's ("Plaintiff")

OPINION AND ORDER

claims.[1]    The parties have given full consent to adjudication of the case by a magistrate judge pursuant to 28 U.S.C. § 636(c).  For the reasons set forth below, Defendant's motion [19] is GRANTED in part and DENIED in part.

### Factual Background

Defendant is a medical transcription company that provides health care documentation to various clients, including clinics, hospitals, and doctor's offices.  (Nolan Dep. 36:1-7.)  Medical professionals send audio clips to Defendant in order to be transcribed, and Defendant returns the completed transcription back to the client.  (Nolan Dep. 36:8-13.)  Defendant's quality assurance role is to ensure that the documentation sent back to clients meets industry quality standards.  (Nolan Dep. 36:14-19.)  According to Plaintiff, in terms of transcribing medical records, there is nothing more important than the quality and accuracy. (Nolan Dep. 36:20-22, 38:6-9.)

Defendant employs Medical Language Specialists ("MLS"), who are responsible for providing medical transcription and medical text editing services.  (Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem.") at 2.)  "All MLS's must pass [Defendant]'s testing procedures, and recently hired MLS's are subject to a 100% review and quality assurance audit, meaning that the MLS's must demonstrate the required proficiency for accuracy before being able to send work directly to clients."  (Def.'s Mem at 2; Nolan Dep.

---

[1] Pursuant to Rule 56, Defendant also raises a series of evidentiary objections regarding Plaintiff's declaration offered in response to Defendant's motion for summary judgment.  (Def.'s Reply Supp. Mot. Summ. J. (Def.'s Reply") at 4-7.)  These objections will be addressed in conjunction with Defendant's motion.

69:3-70:9, 128:14-21, 68:24-69:2, 90:11-91:18.)   Defendant's Quality Assurance Specialists ("QAS") are responsible for the final review of the MLS's transcription reports.   (Def.'s Mem. at 2.) QAS's review dictation and proofread the transcription reports, filling in missing words or phrases when necessary.   (Nolan Dep. 70:4-9.)

Within Defendant's corporate structure, Regional Operations Managers ("ROM") are responsible for direct oversight of MLS's and QAS's.   (Def.'s Mem. at 3.)   ROM's work with Defendant's Quality Assurance Manager ("QAM") to address quality issues regarding QAS's and MLS's.   (Nolan Dep. 41:6-42:22; Fendall Decl. Ex. 2.) Defendant's QAM has "direct oversight and responsibility to ensure quality delivery per the Transcend quality policy and standard for the entire organization."   (Fendall Decl. Ex. 2; Nolan Dep. 43:25-44:7.)   The QAM provides support and guidance to QAS's by, amongst other things, conducting and coordinating "continuing education programs in quality for QA staff and MLS by webinar, conference calls, references, etc." (Fendall Decl. Ex. 2; Nolan Dep. 43:25-44:7.)   The QAM develops and implements policies and procedures for quality delivery, maintains standards and processes for new MLS and QAS hires, and tracks production numbers and audits to ensure quality.   (Nolan Dep. 81:5-82:16, 99:3-23, 109:7-111:23; Fendall Decl. Ex. 2.)   The QAM is also responsible for assisting ROM's "with MLS quality issues" and "offering ideas for improvement."   (Fendall Decl. Ex. 2; Nolan Dep. 41:16-42:8, 44:18-22.)

Prior to being employed by Defendant, Plaintiff worked for Transcription Relief Services, LCC ("TRS") as a Quality Assurance

Manager ("QAM") for approximately three years. (Nolan Dep. 18:24-19:10.) Defendant purchased TRS on April 1, 2009, at which time Plaintiff became Defendant's QAM. (19:1-10. 26:11-16.) Shortly after acquiring TRS, Plaintiff was informed that she would be required to reapply for her position as QAM. (Nolan Dep. 43:8-22.) Although Plaintiff continued performing her duties during the application process, she was not formally awarded the position until July 23, 2009.[2] (Nolan Dep. 43:8-44:11.) As Defendant's QAM, Plaintiff was paid an annual salary of $41,976.00, and she was "eligible to participate" in Defendant's bonus plan, which was based on her "2009 [performance metric] *and* company performance." (Fendall Decl. Ex. 2) (emphasis added). Plaintiff served as Defendant's only QAM and reported directly to Defendant's Director of Quality Assurance.[3] (Nolan Dep. 41:6-9, 46:8-16; Fendall Decl. Ex. 4 at 3.)

According to Plaintiff's Job Description, her "Essential Job Functions" were as follows:

- ▸ Develops, implements and maintains methodologies and guidelines for quality processes to support the Transcend minimum required quality score, to meet or exceed industry average of 98.
- ▸ Develops standards and requirements for new QA hires, including testing, to ensure competency.
- ▸ Coordinates and administers required audit process --routine, random and focused-- as needed at prescribed intervals. Track and trend all related data for analysis and improvement.
- ▸ Tracks and trends QA production numbers on regular

---

[2] Plaintiff's official start date as Defendant's QAM was August 1, 2009. (Nolan Dep. 44:12-14.)

[3] Susan Lucci ("Lucci") served as Plaintiff's original supervisor until September 2009. (Nolan Decl. ¶ 11.) After Lucci resigned, Laurie Leiker ("Leiker") became Plaintiff's supervisor. (Nolan Decl. ¶ 11; Nolan Dep. 46:8-16.)

OPINION AND ORDER               4

basis. Follows up with QA personnel who are not meeting production goals, working with and through the ROM.
► Tracks and trends regular QA staff audits to ensure quality competencies.
► Conducts/coordinates continuing education programs in quality for both QA staff and MLS alike by webinar, conference calls, references, etc.
► Self-education; communicates with QA staff and ROMs regarding conferences or symposia attended, new ideas and standards for [the] industry.
► Mentorship: Motivates and encourages QA staff and MLS in acquiring credentials (CMT/RMT), professional development.
► Assists in development of RFPs in conjunction with ROMs and sales staff to provide customers with complete information on Transcend quality processes.
► Assist ROMs with quality issues, offering ideas for improvement.
► Assist ROMs with customer quality issues, problem resolution; additional contact for HIM personnel; works with clients to establish dictation best practices for increased healthcare documentation quality.
► Editing, QA, and traditional transcription as necessary to ensure TAT.
► Lead the transition program of new graduates as implemented ensuring all data capture points are tracked for reporting.
► Special projects as directed.

(Fendall Decl. Ex. 5; Nolan Dep. 73:17-18.) Plaintiff's Job Description also indicates that the QAM is exempt under the Fair Labor Standards Act, and that the QAM: "Supervises: None -- dotted line to QA staff." (Fendall Decl. Ex. 5.)

Plaintiff admits to performing several of her Essential Job Functions, including, but not limited to: helping develop Defendant's new quality assurance policy and procedure manual; developing a new quality assurance scoring system; tracking QAS's production on both of Defendant's software platforms; performing QAS quality assurance audits and one client-specific audit; providing continuing education updates to QAS's; and being involved in special projects with Defendant's training department. (Nolan

Dep. 79:10-81:4, 109:22-110:12, 112:4-113:11, 117:25-118:9, 120:24-121:8; Fendall Decl. Ex. 6.)  Plaintiff also acknowledges that she monitored the workflow of QAS's; provided weekly production reports documenting QAS's productivity and output; and evaluated the overall performance of QAS's, which, at times, required collaboration with the ROM.  (Nolan Dep. 56:19-20, 57:10-25, 83:9-84:17.)

On December 10, 2009, Plaintiff received her only performance evaluation during the course of her employment with Defendant. (Fendall Decl. Ex. 3.)  Prior to receiving her 120-day evaluation, Plaintiff was asked by Leiker to review the duties and responsibilities in her Job Description and to determine whether she had accomplished those duties.  (Nolan Dep. 133:9-134:8; Fendall Decl. Ex. 6.)  As a result, Plaintiff created a written self-evaluation addressing each of her Essential Job Functions. (Nolan Dep. 133:9-134:8; Fendall Decl. Ex. 6.)  Plaintiff also created a "PLAN/GOAL" for each performance deficiency identified by Leiker. (Nolan Dep.72:8-73:14; Fendall Decl. Ex. 4.)  For example, Leiker indicated that:

> While no one doubts [Plaintiff]'s knowledge and expertise in the field of QA, the knowledge of her job responsibilities is lacking; whether this is due to the sudden change in managers plus my being out for health reasons or just a general lack of confidence/empowerment is unknown. Hopefully this evaluation/assessment process will help with that.

(Fendall Decl. Ex. 4 at 1.)  In response, Plaintiff stated:

> **Based on my job description, I know what my job responsibilities are. Some have been accomplished and others not**, for various reasons detailed and sent to Laurie; for example, I don't see myself ever being involved with the sales team in RFPs.
>
> **PLAN/GOAL: <u>I will reassess my responsibilities and follow</u>**

OPINION AND ORDER                          6

1   **through with these.**

2   (Fendall Decl. Ex. 4 at 1; Nolan Dep. 72:8-25) (alternative

3   emphasis added).

4       On February 12, 2010, Plaintiff gave Defendant two weeks'

5   notice that she intended to quit her job and that her final day of

6   work would be February 26, 2010. (Fendall Decl. Ex. 11; Nolan Dep.

7   140:22-25.)  Prior to her resignation, Plaintiff accepted an offer

8   to become the QAM at AssistMed, Inc. ("AssistMed"), another

9   healthcare documentation company, and began her employment in March

10  2010. (Nolan Dep. 12:11-13:2.)  As AssitMed's QAM, Plaintiff is

11  an exempt employee and is paid a salary of $43,000 annually. (Nolan

12  Dep. 13:4-17.) Plaintiff's duties at AssistMed include maintaining

13  quality standards for the company, auditing and editing,

14  maintaining work flow, and doing quality checks on accounts. (Nolan

15  Dep. 14:11-17, 15:13-18.)  Plaintiff also supervises employees,

16  which entails, "[s]cheduling, just basic supervision, making sure

17  their quality is where it needs to be.  Making sure that people are

18  working where they need to be working."  (Nolan Dep. 14:11-22.)

19                          **Legal Standard**

20      Summary judgment is appropriate "if pleadings, the discovery

21  and disclosure materials on file, and any affidavits show that

22  there is no genuine issue as to any material fact and that the

23  movant is entitled to judgment as a matter of law."  FED. R. CIV.

24  P. 56(c).  Summary judgment is not proper if factual issues exist

25  for trial.  *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir.

26  1995).

27      The moving party has the burden of establishing the absence of

28  a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477

OPINION AND ORDER              7

U.S. 317, 323 (1986).  If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial.  *Id.* at 324.  A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements.  *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party.  *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982).  All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party.  *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate.  *Sankovich v. Life Ins. Co. of N. Am.*, 638 F.2d 136, 140 (9th Cir. 1981).

However, deference to the nonmoving party has limits.  The nonmoving party must set forth "specific facts showing a genuine issue for trial."  FED. R. CIV. P. 56(e).  The "mere existence of a scintilla of evidence in support of plaintiff's positions [is] insufficient."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal

quotation marks omitted).

## Discussion

### I.    Evidentiary Objections

Defendant objects to several paragraphs contained Plaintiff's declaration.  First, Defendant objects to Plaintiff's statements that after June 1, 2009, plaintiff's actual job duties "did not match the job duties that she was suppose to have had per her job description" (Pl.'s Resp. Def.'s Mot. Summ. J. ("Pl's Resp.") at 5) (citing Nolan Decl. ¶ 9), and that she "no longer had many of the other job duties that she had previously with Defendant." (Pl.'s Resp. at 4) (citing Nolan Decl. ¶ 8.)

Defendant claims that these statements directly contradict Plaintiff's testimony that as of late December 2009, she understood she was expected to perform all of the job duties outlined in her job description. (Def.'s Reply at 4.)  Plaintiff has provided the following testimony on this issue:

Q.    This is Exhibit 4. Have you ever seen this?

A.    Yes.

Q.    What is it?

A.    These are my comments in response to my performance
       evaluation.

Q.    That you made?

A.    Yes.

***

Q.    When did you write these?

A.    Probably that same week, let's see, the week of the
       tenth.

Q.    Tenth?

A.    December 10.

OPINION AND ORDER                    9

Q.   December 2009?

A.   Yes.

***

Q.   And you were criticized for not having knowledge of your job responsibilities, or lacking knowledge of you job responsibilities, is that correct?

A.   Yes.

**Q.   And your response was, "based on my job description I know what my job responsibilities are." Is that-**

**A.   Yes.**

**Q.   And that was an accurate statement?**

**A.   Yes.**

***

**A.   My knowledge of job responsibilities was not lacking.**

***

**A.   I knew what my job responsibilities were.**

(Nolan Dep. 72:8-14, 72:21-73:2, 73:5-18, 76:18-19, 76:25) (emphasis added).  Plaintiff also claimed she did, in fact, perform a majority of her Essential Job Functions.  (Fendall Decl. Ex. 6; Nolan Dep. 109:7-12, 133:9-134:3, 49:2-18, 95:14-19, 98:22-99:8.)

The Ninth Circuit's general rule is that

a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony. "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.

*Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991) (internal citations omitted) (quoting *Foster v. Arcata Assoc., Inc.*, 772 F.2d 1453, 1462 (9th Cir. 1985), *cert. denied*, 475 U.S. 1048, 106 S. Ct. 1267 (1986)).  This rule is concerned with "'sham'

1  testimony that flatly contradicts earlier testimony in an attempt

2  to 'create' an issue of fact and avoid summary judgment." *Kennedy*,

3  952 F.2d at 267.

4      I will therefore strike the cited portion of Plaintiff's

5  declaration claiming her job duties "did not match the job duties

6  that she was suppose to have had per her job description." (Nolan

7  Decl. ¶ 9.)  Paragraph 8 of Plaintiff's declaration, which claims

8  she "no longer had many of the other job duties that she had

9  previously with Defendant," will only be stricken, in part, because

10 I am not persuaded that this statement, in its entirety, "flatly

11 contradicts earlier testimony in an attempt to 'create' an issue of

12 fact and avoid summary judgment." *Kennedy*, 952 F.2d at 267.

13     Plaintiff specifically claims she was deprived of the ability

14 to schedule random audits.  (Nolan Decl. ¶ 8.)  This allegation

15 does not explicitly contradict any portion of her deposition

16 testimony, nor does it seem to preclude the possibility that she

17 could have taken the initiative to "[c]oordinate[] and

18 administer[]" random audits in accordance with her Essential Job

19 Functions.[4]  Next, Plaintiff claims her duties no longer consisted

20 of "personnel issues." (Nolan Decl. ¶ 8.)  Such a claim is

21 extremely ambiguous and, without further clarification, it would be

22 nearly impossible to determine whether Plaintiff was flatly

23 contradicting her deposition.  Accordingly, these two portions of

24 Plaintiff's declaration will not be stricken.

25     Plaintiff also claims she no longer participated in "*phone*

26

27     [4]  Perhaps, Defendant preferred that Plaintiff coordinate
rather than schedule random audits in order to ensure that she
28 received approval from her supervisor.

OPINION AND ORDER          11

*meetings* with the operations *team*" after June 1, 2009.  (Nolan Decl. ¶ 8.)  This cannot be reconciled with Plaintiff's deposition testimony.  After discussing "monthly *calls*" with the "QA *team*," Plaintiff said "I had an agenda picked out for the third meeting, and when I . . . told [Leiker] this is what we are going to do, she said, no. I have another agenda."  (Nolan Dep. 94:17-95:13.) Plaintiff responded to Leiker's December 2009 evaluation by stating: "*Next month's* agenda will include a PowerPoint . . . *I will be taking charge of all meetings going forward*."  (Nolan Dep. 72:8-14, 72:21-73:2, 99:3-8.)  Surprisingly, Plaintiff's declaration references the aforementioned events and notes that Leiker became Plaintiff's supervisor in September 2009, three months after she supposedly no longer participated in phone meetings with the operations team.  (Nolan Decl. ¶ 11.)  The cited portion of Plaintiff's declaration is stricken.[5]

Lastly, Plaintiff alleges that, after June 1, 2009, she no longer helped "*update* Defendant's *quality standards* and manuals." (Nolan Decl. ¶ 8.)  In the December 2009 evaluation, Leiker indicated that, [b]eing able to prioritize appropriately seems to be an issue . . . working on *the TTG has appeared on Deb's PITAs*, but as this is something that can be done at any time, it should take a back seat to other, more pressing issues, such as back audits of the QA team."  (Nolan Dep. 81:13-21, 82:3-16, 71:2-4, 74:8-12; Fendall Decl. Ex. 3-4.) Plaintiff was asked:

---

[5]   Although Plaintiff characterizes it as the "operations team," a key word search of the motion for summary judgment documents and corresponding exhibits show that the only calls involving a team were the QA team calls discussed in Plaintiff's deposition testimony.

OPINION AND ORDER              12

**Q.    What is PITA?**

**A.    It was a weekly report that we needed to send to Laurie Leiker, and basically it was just a weekly log of everything that we had done throughout the week.**

**Q.    When did you start having to do those PITAs?**

A.    I actually started doing those with Susan Lucci before she left.

Q.    Do you remember approximately when?

**A.    Probably was maybe June, July.**

(Nolan Dep. 78:8-17.)

**Q.    What is the TTG?**

**A.    That was the Transcend Transcription Guidelines.** It was a document, basically a document of procedures.

Q.    Procedures for what?

**A.    For transcription and [Quality Assurance].**

Q.    And working on that is something that you did as the QA manager?

**A.    They needed some updating**[.]

(Nolan Dep. 81:5-13.)

Based on this testimony, I will strike the portion of paragraph 8 of Plaintiff's declaration that pertains to updating Defendant's quality standards and manuals.

Second, Defendant cites paragraphs 6 and 7 of Plaintiff's declaration as conflicting with Plaintiff's deposition testimony. Paragraphs 6 and 7, claim that, after June 1, 2009, Plaintiff "no longer supervised or managed any other employees of Defendant" and that the ROM's were left to "supervise and manage all aspects of the work performed by the MLS and QAS employees," and that Plaintiff "no longer had any direct interaction with the MLS or QAS

employees, and had very little communication thereafter with the ROM's either."

I deny the motion to strike paragraphs 6 and 7 of Plaintiff's declaration as moot because, as discussed further below, I have determined that the administrative exemption is applicable and, as appropriately recognized in *Dinicola v. State*, 2011 WL 5391657 (Or. Ct. App. Nov. 9, 2011), "Plaintiff's supervision of other employees . . . is not necessarily relevant to, and is certainly not determinative under, the [short] duties analysis of an administrative employee required by the Department of Labor's regulations." *Id.* at *10. Additionally, Plaintiff's claim that she did not have "direct" interaction with the MLS or QAS can be reconciled with her deposition testimony. Plaintiff understood her "dotted line" authority to mean that "in a roundabout way I would have access to the QA specialists," who oversaw the MLS's, "but I would not have the *direct* reports." (Nolan Dep. 41:18-42:5.) And in any event, whether Plaintiff's interactions with MLS's and QAS's was direct or indirect was not to relevant to my analysis. Nor was the frequency with which Plaintiff communicated with ROM's.

Third, Defendant cites paragraphs 9 and 10 of Plaintiff's declaration as conflicting with her deposition testimony. Specifically, Defendant objects to Plaintiff's statements that, after June 1, 2009, her job duties were primarily to perform "data-entry work, such as daily and weekly production reports" and that the "vast majority" of her work hours were spent performing "clerical production work and non-exempt basic QAS transcription work."

OPINION AND ORDER                    14

I will strike the cited portions of Plaintiff's declaration because, under my administrative exemption analysis, I determined that Plaintiff's "primary duty" was quality control which, at times, involved auditing.    Plaintiff's allegation regarding transcription work were clarified further during oral argument:

> THE COURT: You're saying she was sitting down and taking the dictated materials from a doctor and transcribing them herself?
>
> MR. BUCHANAN: Yes, that's exactly was she said [was her] primary job dut[y], and **most of the time** [she] spent working on -- **after June 1st was non exempt medical transcription work. That's exactly it. She's sitting down and doing the actual transcription, just like the lowest level people in the company do, who are not exempt.**

(Hr'g Tr. 31, Dec. 1, 2011.)

Defendant has different "transcription platforms," which are "software systems where the transcription [is done]."  (Nolan Dep. 18-20.)  As the QAM, Plaintiff "developed a new QA production log" for the platforms.  (Nolan Dep. 99:15-16.)  Plaintiff was asked:

> **Q.    Did it help you to become familiar with the platforms by *doing* QA production?**
>
> A.    In a way. I needed to do specifics functions that were not related to QA production, some reporting, some looking at work flow, and doing QA production would have helped me with that.

(Nolan Decl. 83:7-12.)  Defendant's counsel asked Plaintiff if she performed QA production, "but *not* as a regular part of your job duties, correct?"  (Nolan Dep. 131:15-17.)  Plaintiff answered: "That's correct."  (Nolan Dep. 131:18.)

Accordingly, I grant the motion to strike this portion of Plaintiff's declaration as well.

///

///

OPINION AND ORDER              15

**II.  Overtime Wage Claims**

This is an action brought pursuant to the Fair Labor Standards Act ("FLSA" or "the Act") and the Oregon wage and hour statutes, which require employers to pay overtime compensation to employees who work more than forty hours in a work week.  29 U.S.C. § 207(a)(1); OR. REV. STAT. § 653.261(1).  Both FLSA and Oregon law exempt "bona fide executive, administrative, *or* professional" employees from coverage.  29 U.S.C. § 213(a)(1); OR. REV. STAT. § 653.020(3).  It is Defendant's position that Plaintiff "fell within both the administrative and executive exemptions to the FLSA and Oregon's overtime requirements."  (Def.'s Mem. at 8.)

**A.  FLSA Claim**

Exemptions to the FLSA are narrowly construed, and the employer bears the burden of proving that the employee fits "plainly and unmistakenly" within the exemption's terms.  *Serv. Employees Inter. Union, Local 102 v. County of San Diego*, 60 F.3d 1346, 1350 (9th Cir. 1994), *cert. denied*, 516 U.S. 1072 (1996). The Act delegates broad authority to the Secretary of Labor to define and delimit the scope of the administrative exemption; therefore, the Secretary has formulated the "short duties test," to determine whether employees who earn at least $455 per week, such as Plaintiff,[6] qualify for the administrative exemption.  *In re Farmers Ins. Exch.*, 481 F.3d 1119, 1127 (9th Cir. 2007). Specifically, the employee's "primary duty" must (1) consist of

---

[6]  While employed by Defendant, Plaintiff received an annual salary of $41,976.00, or "approximately $807.00 per week[.]" (Def.'s Mem. at 9.) It is thus evident that the salary-basis test is satisfied, and Plaintiff does not argue otherwise.

"the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers;" and (2) "include[] the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.200(a) (2004).

The term "primary duty" is defined as "the principal, main, major or most important duty that the employee performs," and is determined by assessing "the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a) (2004).  Relevant factors to consider include "the relative importance of the exempt duties as compared with other types of duties" and "the amount of time spent performing exempt work[,]" but time alone should not guide the court's inquiry because there is no requirement "that exempt employees spend more than 50 percent of their time performing exempt work."  29 C.F.R. § 541.700 (a)-(b).

### 1.    The Short Duties Test

#### a.    Prong One

As to the first prong of the short duties test, which Plaintiff's counsel did not contest, Defendant argues that Plaintiff's duties as QAM unquestionably consisted of non-manual work related to their general business operations. (Def.'s Mem. at 10.)  According to Defendant, "Plaintiff was responsible for ensuring that MLS's created accurate transcriptions and that its QAS's were able to correct errors or omissions, so that the product provided to the company met industry quality standards and was the highest quality possible." (Def.'s Mem. at 10.)  Defendant is a

OPINION AND ORDER              17

medical transcription company and, as Plaintiff concedes, the quality of the transcription is the single most important factor in transcribing medical records.

Under the first prong, "an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment."   29 C.F.R. § 541.201(a) (2004).   Such work includes, but is not limited to:

> [W]ork in functional areas such as tax; finance; accounting; budgeting; **auditing**; insurance; **quality control**; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities.

29 C.F.R. § 541.201(b) (2004) (emphasis added).

Here the record leave no question of fact regarding whether Plaintiff performed work directly related to assisting with the running or servicing of Defendant's business because Plaintiff's duties dealt primarily with quality control and auditing, functional areas which are independent upon one another in the medical transcription industry.   As Plaintiff acknowledged in her testimony, she "needed to do audits of the individual QA specialists . . . to ensure their quality was where it needed to be."   (Nolan Dep. 80:4-6.)   Plaintiff also admitted that she "tracks and trends, regular QA staff audits to ensure quality, competencies," which was one of her Essential Job Functions. (Nolan Dep. 112:24-113-11.)   Moreover, Plaintiff was in charge of overseeing a biannual client-specific audit that she described as

1  a "very, very extensive, intensive, detailed audit[.]" (Nolan Dep.
2  79:10-22.)

3      In short, § 541.201(b), in combination with Plaintiff's
4  admission that quality is the single most important factor in
5  transcribing medical records, demonstrates that the first prong of
6  the short duties test is met.

7              **b.   Prong Two**

8      Plaintiff rests her case solely on disputing the second prong
9  of the short duties test.   The FLSA only requires that an
10  employee's primary duty "*includes* the exercise of discretion and
11  independent judgment with respect to matters of significance."   29
12  C.F.R. 541.200(a)(3) (2004) (emphasis added).

13      Relying on 29 C.F.R. § 541.202(c),[7] Plaintiff first claims the
14  administrative exemption is inapplicable because the employee's
15  "discretion and independent judgment" must "be free from immediate
16  direction or supervision." (Pl's Resp. at 9.)   This argument lacks
17  merit.   Under the federal regulations, "employees can exercise
18  discretion and independent judgment even if their decisions or
19  recommendations are reviewed at a higher level. *Thus, the term*
20  *'discretion and independent judgment' does not require that the*
21  *decisions made by an employee have a finality that goes with*
22  *unlimited authority and a complete absence of review.*" 29 C.F.R.
23  § 541.202(c) (2004) (emphasis added).

24      Next, Plaintiff argues that second prong is not met because
25
26  _____

27      [7]  The court assumes that Plaintiff's counsel was referencing
    Title 29 of the Code of Federal Regulations, despite using the
28  abbreviation for the United States Code.

OPINION AND ORDER              19

"employees who merely apply their skills in following prescribed procedures for determining whether specified standards are met," and who do not exercise discretion as to matters of significance, fail to meet this requirement. (Pl.'s Resp. at 9-10.)

It is true that "[t]he exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." 29 C.F.R. 541.202(f) (2004).[8] The only "manual or other source" at issue in this case would be Transcend's Quality Assurance/Document Completion Policy and Program ("the QA Policy") and Transcend's Transcription Guidelines ("TTG"), which Plaintiff helped to develop and update, respectively. (DonFrancesco Decl. ¶¶ 2-3.)

In regards to the QA Policy, Plaintiff has stated, "[a]long with Karin Uhrich, Val Hoflack, and Susan Lucci, I helped to develop the new Transcend QA policy and procedure manual." (Fendall Decl. Ex. 6). Plaintiff's testimony sheds light on the QA Policy's use:

> A.  It was [] a document that was given to clients when a request for proposal was done. And so it was not only a company manual, but also something that the sales team used. And I think I said before that I worked on those with Susan Lucci, and it was team of people right when we were first purchased by Transcend.
>
> Q.  And so the [QA Policy] would describe for the

---

[8]  In addition, the "use of manuals, guidelines or other established procedures containing or relating to highly technical, scientific, legal, financial or other similarly complex matters that can be understood or interpreted only by those with advanced or specialized knowledge or skills *does not preclude exemption*." 29 C.F.R. § 541.704 (emphasis added).

client what you do to ensure accuracy of the
transcription, is that accurate?

A.   Yes.

Q.   And [the QA Policy] also internally described how
medical transcriptionists and QA specialists should
perform their duties, is that accurate?

A.   Yes.

(Nolan Dep. 103:3-18).   As to the TTG, Plaintiff provided the

following testimony:

Q.   What is the TTG?

A.   That was the Transcend Transcription Guidelines. It
was a document, basically a document of procedures.

Q.   And working on [the TTG] is something that you did
as the QA Manager?

A.   They needed some updating and they needed to be
improved to assist our QA specialists and our
MT[S']s with their day-to-day work.

(Nolan Dep. 81:5-8, 81:11-15.)

Clearly, Plaintiff's relation to, and usage of, the TTG and QA

Policy was not limited to applying well-established techniques,

procedures or specific standards described in a manual.   In fact,

Plaintiff did not mindlessly follow the TTG or QA policy's

mandates, she contributed materially to their development and

contents in order to aid the QAS's and MLS's.

I also disagree with Plaintiff that she did not exercise

discretion as to "matters of significance," which "refers to the

level of importance or consequence of the work performed."   29

C.F.R. § 541.202(a).   It is undisputed that quality control, which

involved auditing, was vital to Defendant's day-to-day operation

and success.

Turning to whether Plaintiff exercised "discretion and

OPINION AND ORDER                 21

independent judgment," the court is guided by, but not limited to, factors such as whether the employee: (1) "has authority to formulate, affect, interpret, or implement . . . operating practices;" (2) "carries out major assignments in conducting the operations of the business;" (3) "performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business;" (4) "has authority to waive or deviate from established policies and procedures without prior approval;" or (5) "investigates and resolves matters of significance on behalf of management[.]"  29 C.F.R. § 541.202(b).

Several of § 541.202(b)'s factors are present on the record. For example, with respect to the first factor, "[P]laintiff developed Transcend's quality guidelines and procedures; updated and improve the [TTG]; developed and created a new QA production log and system; and developed testing procedure for new QAS hires." (Def.'s Mem. at 14.)  With respect to the second and third factors, Plaintiff "coordinated and monitored Transcend's quality assurance audit process; performed training reviews of new MLS hires; monitored and evaluated the performance and productivity of Transcend's QAS team; provided continuing education and training opportunities; and identified quality issues that needed to be addressed."  (Def.'s Mem. at 15.)

Accordingly because the FLSA administrative exemption is applicable, Defendant's are entitled to summary judgment as to Plaintiff's federal overtime wage claim.

///

OPINION AND ORDER              22

### B.    State Law Claim

In *Dinicola*, the Oregon Court of Appeals recognized that the Commissioner of the Bureau of Labor and Industries expanded the statutory definition of administrative employee "in ways that are consistent with the rules under the FLSA." *Id.* at *11. Accordingly, as in *Dinicola*, I reach the same conclusion as under the FLSA and hold that Plaintiff was an exempt administrative employee under Oregon law. *Id.*

### III. **Bonus Wage Claim**

Plaintiff has brought a claim "for failure to pay all bonus wages in a timely manner following termination of employment, pursuant to ORS 652.150. (Compl. ¶ 8.) Defendant agrees that, under ORS 653.055, "[a]ny employer who pays an employee less than the wage to which the employee is <u>entitled</u>," is liable to the employee. (Def.'s Reply at 19) (emphasis in the original). Defendant claims Plaintiff was not entitled to a 2009 performance bonus because the award of such a bonus was a discretionary matter.

Without citing any case law, Plaintiff argues that "bonus wages were not discretionery [sic], but promised to her as part of her wage package. Therefore, a duty of good-faith and fair dealing applies to Defendant's duty to pay that bonus. A genuine issue of fact exists as to whether that duty was met." (Pl.'s Resp. at 10.) The crux of Plaintiff's position, as confirmed by counsel during oral argument, is that Defendant never established her individual performance metrics, thereby precluding the possibility that she could qualify for a bonus.

Defendant relies solely upon *Shahriary v. Teledesic LLC*, 60

Fed. Appx. 157 (9th Cir. 2003). There, the plaintiff-employee had received "every bit of compensation promised to him pursuant to his employment contract, with the exception of a year-end bonus." *Id.* at 162. The employment offer indicated he would "be eligible to receive an annual bonus in the discretion" of his employer. *Id.* Bonus eligibility was based, as here, on the company's success and individual performance objectives that were to be mutually determined. *Id.* Applying Washington state law, the Court of Appeals "agree[d] with the district court that under the terms of their agreement, [the employer] had no obligation to award [] a bonus." *Id.* Its failure to do so, therefore, did not give rise to any recoverable damages, as required to establish a claim for breach of the covenant of good faith and fair dealing. *Id.*

I find Defendant's reliance on *Shahriary* unavailing. In Oregon, "when an employment contract vests an employer with discretion [regarding conferral of] a particular employment benefit, the discretion must be exercised in good faith. Stated differently, even if the employer's discretion extends to denying the benefits, its decision to do so must be made in good faith." *Furrer v. Sw. Or. Cmty. Coll.*, 196 Or. Ap.. 374, 381 (2004). There is nothing on the record, however, indicating how, or if, Defendant actually evaluated Plaintiff's bonus eligibility, making it impossible to evaluate whether Defendant acted "in an objectively reasonable manner in the performance and enforcement of their contract." *U.S. Nat'l Bank of Or. v. Boge*, 311 Or. 550, 556 (1991).

Moreover, in *Walker v. Am. Optical Corp.*, 265 Or. 327 (1973),

OPINION AND ORDER          24

1   the Oregon Supreme Court held that a "bonus plan offered by the
2   employer normally becomes binding as unilateral contract when the
3   employee begins performance of the terms of the proposed plan, in
4   the sense that the plan cannot then be revoked by the employer."
5   *Id.* "It does not follow, however, that the employee thereupon
6   becomes entitled to the bonus payment" when "the bonus plan
7   specifically provided that the bonus" was subject to a condition
8   precedent and the employee failed to satisfy its terms. *Id.* at
9   330-31. That is to say, the employer is not obligated to pay the
10  bonus until the employee satisfied all conditions precedent, *i.e.*,
11  when the employee's rights vest. *State ex. rel. Roberts v. Pub.*
12  *Fin. Co.*, 294 Or. 713. 718 (1983).

13       Here, the requisite time period required for Plaintiff's 2009
14  rights to vest was met, and there were two conditions that needed
15  to be satisfied in order to be eligible for a bonus at that time,
16  satisfactory company performance and exceeding Plaintiff's
17  individual performance metrics. Neither party has presented
18  evidence concerning how Defendant's performance was evaluated in
19  2009 for the purposes of issuing bonuses, however. Nor has it been
20  demonstrated that Plaintiff failed to meet her 2009 performance
21  metrics because, based on this record, it appears they were never
22  established. According to the July 23, 2009 job offer Plaintiff
23  accepted, the parties were to "jointly develop" the metric. It is
24  not clear whether the failure to establish the metric was due to
25  the neglect of the Plaintiff or Defendant.

26       In short, viewing the evidence in the light most favorable to
27  the nonmoving party, Defendant has failed to demonstrate the
28

OPINION AND ORDER          25

absence of a genuine issue of material fact as to Plaintiff's bonus wage claim.

Defendant had moved to strike Plaintiff's statement that "[e]ach of the other employees that did receive a bonus were apparently graded on what percentage of their performance metrics/goals had been met."   (Pl.'s Resp. at 9; Nolan Decl. ¶ 16.)  Because I deny the motion for other reasons stated above and this argument by Plaintiff played no part in that ruling, I do not rule on Defendant's motion to strike this testimony as it is moot. However, in the interest of providing some insight for trial preparation on this issue I note that no explanation has been provided as to whether Plaintiff's co-workers, who may have received an annual bonus based on an individual performance metric, are appropriate comparators, *i.e.*, whether Plaintiff's co-workers had any responsibility in developing their performance metrics, nor whether they in fact did participate in their development.  In addition, the potential relevance of that inquiry is attenuated by the need to examine whether those employees met their objectives and whether Plaintiff would have met her undeveloped objectives. It is also not clear whether Plaintiff's reference to other employees includes exempt and/or non-exempt employees among many other details.

### III. Straight-Time Claim

Although Plaintiff's counsel made no reference to this fact in his response to Defendant's motion, during oral argument he contested whether Defendant's motion covered all claims, as purported.  Plaintiff's counsel claimed that his client's regular

pay was not timely, thus entitling her a "late pay penalty" under ORS 652.150.

Plaintiff's counsel directed the court to Paragraph 8 of the Complaint, which states, "[b]ecause of Defendant's failure to pay Plaintiff all earned bonus wages in a timely manner following termination of employment, including the fact that Plaintiff's final check was paid to Plaintiff 9 days late following her [resignation] from employment, Plaintiff is entitled to a statutory penalty in the amount of $4,843.20 from Defendant, pursuant to ORS 652.150[.]" (Compl. ¶ 8.)  Plaintiff's prayer for relief only seeks the following, however:

> 1. For unpaid overtime wages, in the amount $26,790.42;
>
> 2. For unpaid bonus wages, in the amount of $3,000.00;
>
> 3. For liquidated damages, in the amount of $26.790.42;
>
> 4. For statutory penalty wages of $4,843.20, for failure to pay all overtime wages[;]
>
> 5. For a statutory penalty of wages of $4,843.20, for failure to pay all bonus wages[; and]
>
> 6. For prejudgment interest at the legal rate of 9% annum on all unpaid overtime wages and bonus wages, from the dates due, until final judgment is entered.

(Compl. at 4.)

Noticeably absent from the prayer for relief is a request for a statutory penalty stemming from an alleged failure to deliver Plaintiff's final check in a timely manner.[9]  Plaintiff's counsel claims this deficiency was due to a litigant's ability to "only get

_____

[9]  It is also noteworthy that Plaintiff's complaint *only* alleges that, "Defendant [] wilfully, knowingly and despite demand, failed to pay Plaintiff's earned overtime wages" and earned bonus wages.  (Compl. ¶¶ 4-5.)

OPINION AND ORDER          27

the penalty once," and since the "two penalties overlap, [] the nine days for the late pay[] would be included in the full 30 days pay. *So we're only asking for the 30 days pay once*." (Hr'g Tr. 35) (emphasis added). Presumably, Plaintiff's counsel is referencing the fact that, under ORS 652.150, "an employee has but a single claim for penalty wages, the magnitude of which depends on the duration of the employer's continued failure to pay earned wages. . . . [A] new and larger penalty accrues with each day that passes, essentially superseding the smaller penalty that existed the previous day," capped out at 30-days. *Russell v. U.S. Bank Nat'l Ass'n*, 2011 WL 4820322, at *3 (Or. App. Oct. 12, 2011).

Because I denied Defendant's motion as to Plaintiff's bonus wage claim, Plaintiff still has a viable 30-day claim for penalty wages. But this penalty is tied solely to Plaintiff's bonus wage claim, as Plaintiff's counsel drafted the complaint. If Plaintiff's counsel was attempting to plead a straight-time claim, alleging that "ORS 652.140 was violated, leading to a penalty under ORS 652.150," (Hr'g Tr. 22), then the complaint should have complied with Rule 8(a)'s requirements.[10] As the Ninth Circuit has recognized, "summary judgment is not a procedural second chance to flesh out inadequate pleadings." *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008) (quoting *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 922 (9th Cir. 2006)).

---

[10]   Rule 8(a) provides, in pertinent part, that, "[a] pleading that states a claim for relief *must contain* . . . (2) a short and plain statement showing that the pleader is entitled to relief; and (3) *a demand for the relief sought, which may include relief in the alternative or different types of relief*." FED. R. CIV. P. 8(a) (emphasis added).

OPINION AND ORDER          28

1    I therefore decline to consider Plaintiff's newly-asserted

2    straight-time claim.

3                          **Conclusion**

4        For the foregoing reasons, Defendant's motion [19] is GRANTED

5    in part and DENIED in part.

6        Dated this 4th day of January, 2012.

7                                    /s/ Dennis J. Hubel

8                          _____

9                              Dennis James Hubel
                             Unites States Magistrate Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPINION AND ORDER                    29